IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| THERESA LOUISE MILLER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 6:13-CV-39 |
| ) | |
| CAROLYN W. COLVIN,[1] ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Plaintiff Theresa Louise Miller ("Miller") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Specifically, Miller alleges that the Administrative Law Judge ("ALJ") erred by giving improper weight to the opinion of her treating physician and by relying on testimony from the vocational expert that insufficiently accounted for her intellectual limitations. I conclude that substantial evidence supports the ALJ's decision on both grounds. As such, I **RECOMMEND DENYING** Miller's Motion for Summary Judgment (Dkt. No. 21), and **GRANTING** the Commissioner's Motion for Summary Judgment. Dkt. No. 17.

## STANDARD OF REVIEW

This Court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Miller failed to demonstrate that she was disabled

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is hereby substituted for Michael J. Astrue as the defendant in this suit.

1

under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Miller protectively filed for SSI and DIB on April 21, 2010, claiming that her disability began on April 20, 2010. R. 20, 224. The state agency denied her application at the initial and reconsideration levels of administrative review. R. 132–44. On January 31, 2012, ALJ Brian Rippel held a hearing to consider Miller's disability claim. R. 35–77. Miller was represented by an attorney at the hearing, which included testimony from Miller and vocational expert Robert Jackson.

On February 17, 2012, the ALJ entered his decision analyzing Miller's claim under the familiar five-step process[3] and denying Miller's claim for benefits. R. 20–30. The ALJ found that

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[3] The Commissioner uses a five-step process to evaluate a disability claim. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). The Commissioner asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

2

Miller suffered from the severe impairments of cerebrovascular accident (CVA), chronic obstructive pulmonary disease (COPD), tobacco abuse, essential hypertension, hernias, degenerative lumbar disc disease, an affective disorder, borderline intellectual functioning, and somatoform disorder. R. 22–23. The ALJ found that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 23. The ALJ further found that Miller retained the residual functional capacity ("RFC") to perform light work, with additional limitations of only occasional climbing and stooping; frequent balancing, kneeling, crouching and crawling; no concentrated exposure to irritants, hazardous machinery, or unprotected heights; simple, routine, repetitive tasks; and occasional interaction with the public, co-workers, and supervisors. R. 24. The ALJ determined that Miller could not return to her past relevant work as a hearing aid solderer (R. 28), but that Miller could work at jobs that exist in significant numbers in the national economy, such as an inspector or packer. R. 28–29. Thus, the ALJ concluded that she was not disabled. R. 29. On May 6, 2013, the Appeals Council denied Miller's request for review (R. 1–6), and this appeal followed.

## ANALYSIS

Miller puts forth two arguments why the ALJ's decision is not supported by substantial evidence. First, from a physical standpoint, Miller alleges that the ALJ gave improper weight to the opinion of his treating pain management physician. Second, from a mental standpoint, Miller asserts that the ALJ failed to adequately consider her low IQ and intellectual limitations in relying on testimony from the vocational expert.

### Treating Physician

Miller argues that the ALJ improperly weighed the opinion of Marc Alan Swanson, M.D., of Blue Ridge Pain Management Associates ("Blue Ridge"). Dr. Swanson concluded in a

3

physical functional assessment in January 2012 indicating that Miller was capable of a less than a full range of sedentary work activity, and that she would be absent from work a prohibitive amount of time. The ALJ accorded this opinion little weight because Dr. Swanson "essentially adopted the claimant's subjective statements without balance, objectivity, or support from the objective evidence of record documenting less frequent, conservative treatment and observations of less significant signs or symptoms." R. 27. I find that the ALJ's decision to accord lesser weight to the opinion of Dr. Swanson is supported by substantial evidence.

The social security regulations require that an ALJ give the opinion of a treating physician source controlling weight, if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); Saul v. Astrue, 2011 WL 1229781, at *2 (S.D. W.Va. March 28, 2011). Further, if the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. § 416.927(c)(2)–(5). "None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion." Ricks v. Comm'r, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010) (citations omitted).

From a physical standpoint, the medical record reflects that during the relevant period Miller reported back, shoulder, and hand pain. Treatment notes show that Miller's medical

4

providers were primarily concerned about the level of muscle mass in her back, her tobacco abuse, and maintaining a healthy weight through nutrition and exercise.

Miller alleges disability starting April 20, 2010, when she saw Matthew Manico, PA-C at Blue Ridge Pain Management Associates ("Blue Ridge"). R. 377. Miller reported to Mr. Manico that she had been working four 13-hour shifts at Advance Auto, but that she was fired for failing to keep up with the production. Mr. Manico remarked that in light Miller's past problems with deficient muscle mass, weight, and conditioning, "it is not surprising she would have difficulty in a difficult work environment." Mr. Manico noted that Miller's weight at 108 pounds was deceptive because her muscle mass quality was "quite poor." Miller reported widespread pain in her spine. On examination, Mr. Manico noted that Miller was not in acute distress, was alert and oriented, but that she had trouble getting on and off the exam table "to a mild severity." Miller was kyphotic, had "terrible muscle mass along the thoracic spine," shoulder motion showed end-range impingement, and her trunk motion was impaired. Mr. Manico also observed significant myofascial findings. Mr. Manico diagnosed Miller with polysegmental lumbar degenerative disc disease, myofascial pain, chronic lumbar myalgias, and poor appetite with cachexia, possibly caused by morphine or cigarettes. Mr. Manico took Miller off morphine and prescribed Percocet and recommended that she quit smoking. Mr. Manico noted that "[s]he would have difficulty going back to a heavy work environment I believe. She may want to consider something more sedentary in nature or office based."

Miller visited East Lake Medical center on April 24, 2010, and reported that her back was "giving her a fit." R. 430. Miller again reported that she was recently fired for not keeping up on the job. Miller stated that she was still smoking at that time and that she will quit when she gets disability. Miller was told to go to social services and to seek unemployment.

5

Miller did not seek treatment for more than two months, and on June 29, 2010, she returned to see Mr. Manico at Blue Ridge. R. 369. Miller reported "doing fairly good" since her last visit in April 2010, and that the medication adjustment had helped with her upset stomach. Mr. Manico noted that Miller was still smoking and taking poor care of herself overall. Mr. Manico's office note described Miller having some difficulty getting on and off the exam table, but that Miller was able to toe walk and heel walk, had good range of motion in her trunk, and had fairly good lateral motion in her neck. Miller's shoulders again exhibited end-range impingement. She showed some parascapular muscle mass loss. Miller's gait was symmetric with poor trunk and hip motion, but no lurch was observed in her gait. Mr. Manico suggested decreasing her dosage of Percocet if she failed to add weight, but refilled her prescriptions and asked to see her again in two months. Mr. Manico noted that "[s]he needs to put the cigarettes down and start walking more as well."

On August 24, 2010, state agency physician Robert McGuffin, M.D., reviewed Miller's medical file at the initial consideration level. R. 78–89. Dr. McGuffin determined that, from a physical standpoint, Miller was capable of performing a range of light work.[4]

Miller returned to Blue Ridge on September 7, 2010, this time to see Marc Swanson, M.D. R. 421. Miller reported back, buttock, shoulder, and neck pain, and reported nutritional issues. Dr. Swanson noted that Miller's departure from production work was of "great benefit" to her pain and possibly her nutritional issues. Dr. Swanson noted that Miller's medications remained helpful, and that Blue Ridge was "trying to push her exercise regimen" before beginning to reduce her opiates. Miller's weight was up to 116 pounds. Miller exhibited modest

---

[4] As defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."

6

pain in her skull base and cervicothoracic juncture, and her shoulders abduction and extension and scapular excursion were impaired. Dr. Swanson noted that Miller's pectoralis, biceps, triceps and forearm power had modest deficiencies. Miller's iliolumbar, gluteal, piriformis area, and sciatic notch pain were modest. Dr. Swanson also indicated that Miller's gluteal muscle mass, iliopsoas and quadriceps power remained somewhat deficient, and that she had evolving hand, wrist, and knee atrophy. Dr. Swanson wrote that "[t]here is no way she could do the labor intensive work at Advance Auto." Dr. Swanson adjusted her medication and asked her to follow up in two or three months.

On November 19, 2010 Miller saw Mr. Manico at Blue Ridge, and reported that she was receiving unemployment benefits. R. 420. Miller was still smoking, not exercising as recommended, and was not taking very good care of herself. Miller weighed 121 pounds, reflecting an increase of five pounds in two months. Mr. Manico noted poor calf and quad muscle mass, and described Miller's quads as "doughy." Miller's trunk extension was fairly good, forward flexion capacity was poor, and rotational and lateral motions were impaired. Mr. Manico renewed Miller's prescriptions and again recommended that she stop smoking and start an exercise program. Mr. Manico also stated that he "[m]ay consider reducing meds in the future if she is not getting on board with lifestyle changes."

Miller followed up with Mr. Manico on February 4, 2011, and reported that since her last visit she was doing fairly well and that she was looking for a job. R. 419. Miller stated that she was walking more and working on her nutrition, but that she was still smoking. Miller's weight was down five pounds to 116, which Mr. Manico described to be near ideal. During a physical examination, Miller did not have any difficulty getting on or off the exam table; was able to heel and toe walk; and could do a partial squat. Miller's triceps and periscapular muscle mass was

7

still deficient, but that she had an improved range of motion in her shoulders. Mr. Manico found that Miller had added quad strength, but her calf strength was still deficient. Mr. Manico observed good range of motion in her knees and hips, but that her trunk range of motion was still limited. As a result of these improved findings overall, Mr. Manico planned a reduction in Miller's opioid medication in future visits.

A little more than three months later, Miller followed up with Mr. Manico. R. 450. Miller reported doing about the same since her last visit; she was still smoking, but had been exercising through a self-paced program. Miller added six pounds, weighing 122 pounds, and Mr. Manico described her activity level as stable. Mr. Manico recorded significant myofascial findings, but that "there is no true radicular pain though." Miller had minor spasms in her shoulder, but her shoulders had full range of motion passively, her AC joint was nontender, and she had no significant impingement. Miller had some pain in her SI joint and her hip abductors showed mild tenderness. Miller's calf and quad muscles were subadequate, but her knees hinged fairly well and she was neurovascularly intact in her lower extremities. Mr. Manico refilled her prescriptions and wanted Miller to increase her walking program and quit smoking.

Miller's final visit with Mr. Manico at Blue Ridge came on October 11, 2011. R. 451. Miller reported that she had some difficulty since her last visit, and that she had unsuccessfully tried to work but had been terminated for not keeping up the pace. Miller reported myofascial pain in her neck, fingers, and hands. Miller had been taking poor care of herself, was not exercising much, and was still smoking. On physical examination, Miller had no difficulty getting on or off the exam table, and could toe walk, heel walk, and do a partial squat. Miller's trunk range of motion was mildly limited, and she had mild paralumbar spasms in her back. Miller's neck had some crepitus with flexion and extension. Miller had good motion and no

8

significant sensory loss in her shoulders and elbows, her hands did not show any nodules consistent with arthritis, and there was no locking in her fingers. Mr. Manico reduced Miller's pain medication, asked Miller to follow up in three months, and again recommended that she quit smoking. Mr. Manico also stated he would seek neck and hand x-rays once Miller's insurance information was verified.

On May 2, 2011, state agency physician Joseph Duckwall, M.D., considered Miller's medical record at the reconsideration level, and similar to Dr. McGuffin at the initial level, found Miller capable of performing a range of light work. R. 104–16.

In a check-the-box medical source statement filled out on January 28, 2012, Dr. Swanson provided his opinion of Miller's functional ability. R. 453–54. Dr. Swanson determined that Miller could occasionally lift 10 pounds and frequently lift and carry less than 10 pounds. R. 453. According to Dr. Swanson, Miller was capable of standing and walking for about four hours in an eight-hour workday with breaks, and about two hours continuously. Dr. Swanson concluded that Swanson could sit for about six hours in an eight-hour workday, and would require the ability to shift at will from standing/walking and sitting. Dr. Swanson believed Miller would require two 15 minute breaks during the workday in addition to normal workday breaks. Dr. Swanson indicated that Miller could rarely stoop and crouch/squat, and occasionally reach. Dr. Swanson also suggested that Miller's pain and symptoms would frequently interfere with her attention, concentration, and work pace. R. 453–54. Dr. Swanson determined that Miller's impairments would require absences more than three times a month. Dr. Swanson identified Miller's degenerative disc disease and muscle mass deficiencies associated with nutritional deficiencies as the cause of her impairments. R. 454.

9

Substantial evidence supports the ALJ's conclusion that Dr. Swanson's opinion was not supported by the objective evidence of record. As stated by the ALJ, Miller's treatment history during the relevant period was relatively infrequent and consisted of solely conservative measures. Miller's visits to Blue Ridge, her primary healthcare provider at the time, came roughly every two to three months. Dr. Swanson apparently only personally examined Miller once during the period of alleged disability (R. 421), although physician's assistant Mr. Manico of Blue Ridge was Miller's primary provider during that time. R. 369, 377, 420, 449–51. Treatment notes indicate that Miller sought routine follow-up care during these visits rather than treatment for acute incidents of physical distress. Mr. Manico managed Miller's pain with medication adjustments, even striving to wean Miller off of Percocet. Indeed, a key part of Dr. Swanson and Mr. Manico's treatment plan was *increasing* Miller's activity level and amount of exercise to develop muscle mass. At no time did Miller's providers refer her to a physical therapy specialist or for a surgical consultation. Furthermore, Miller was never hospitalized following her alleged onset date, never received injections, and never required any brace or assistive device. Along with regular exercise, Miller was encouraged to eat healthier and stop smoking. This sort of treatment history is quintessentially conservative, as stated by the ALJ, and is not suggestive of impairments that would prevent an individual from performing a range of light work.

Dr. Swanson's opinions are also not supported by Blue Ridge's physical examinations of Miller from the relevant period, which suggested moderate limitations at best. Miller was never in acute distress from her impairments. R. 369, 377, 419–21, 450–51. While Miller had some impingement in her shoulder, this had improved by February 2011. R. 419. Furthermore, although Miller exhibited signs of myofascial pain, in May 2011 Mr. Manico observed no true

10

radicular pain. On several occasions Miller showed no difficulty getting on and off the exam table, and was able to perform toe and heel walks. R. 451. After Miller added weight and began an exercise regimen during the spring of 2011, as recommended by her providers, the results of her physical examinations were particularly benign. R. 419, 450. Miller's health regressed when she stopped exercising regularly in October 2011, suggesting that compliance with her recommended treatment helped relieve her symptoms. R. 451. Miller's treatment history, her improvement with when she complied with treatment recommendations, and the relatively benign results of physical examinations fail to support Dr. Swanson's opinion of severe limitations. As the ALJ found, the longitudinal record from the relevant period is more consistent with the state agency doctors' conclusion that Miller could perform light work.

As suggested by the ALJ in his reasoning, that medical providers have documented a claimant's subjective complaints in their assessments or notes does not transform those complaints into objective clinical evidence. See Webb v.. Astrue, 2012 WL 3061565, at *17 (N.D.W. Va. June 21, 2012) (citing Craig v. Chater, 76 F.3d 585, 590 n. 2 (4th Cir.1996)). Little objective clinical evidence supports Dr. Swanson's restriction of Miller to sedentary work and his finding that she would frequently be absent from work. This Court reviews the ALJ's decision and the record to determine if substantial evidence supports the conclusion to accord little weight to Dr. Swanson's opinion. The ALJ thoroughly reviewed the entire record and specifically the findings on physical examination by Miller's prior providers. There is no suggestion that the ALJ failed to consider evidence in the record, took into account evidence not in the record or based his decision on an improper legal standard. Given the thorough review of the record by the ALJ, I am constrained to find that because substantial evidence supports the

11

ALJ's decision to accord Dr. Swanson's opinion lesser weight, I must recommend affirming his decision.

## Vocational Expert

Miller argues that the ALJ erred by excluding testimony from the vocational expert about any effect Miller's IQ score and general learning ability had on her ability to perform unskilled work. As a result, Miller contends that the ALJ relied on vocational testimony that was incomplete, and that she was incapable of performing the jobs suggested by the vocational expert. I find that substantial evidence supports the ALJ decision that jobs existed which Miller was able to perform.

It is the Commissioner's burden at step five of the sequential analysis to establish that the claimant can work at jobs that exist in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975). "To decide whether the claimant is disabled under this standard, the ALJ must proceed in a two-tiered analysis." Morgan v. Barnhart, 142 F. App'x 716, 720 (4th Cir. 2005). First, the ALJ must determine the claimant's residual functional capacity, and second, the ALJ must show that there are jobs available that the claimant is capable of performing. Id.

The purpose of a vocational expert is to assist the ALJ in making the determination that the claimant can perform available jobs by testifying in response to hypothetical questions posed by the ALJ that reflect the claimant's work-related abilities. Walker v. Bowen, 889 F.2d 47, 50–51 (4th Cir. 1989). "In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." Id. (internal citations omitted). Furthermore, an ALJ's error with respect to a claimant's RFC may

12

"translate[] into deficient hypotheticals" posed to the vocational expert. Morgan, 142 F. App'x at 720. Therefore, an inquiry into whether the ALJ erred in posing hypotheticals to a vocational expert necessarily requires the court to examine the underlying RFC.

The ALJ found that Miller was capable of performing a range of light work, limited to simple, routine, repetitive tasks, and occasional interaction with the public, co-workers, and supervisors. R. 24–25. The record shows that Miller has some intellectual deficiencies, especially in reading and writing. Miller testified at the administrative hearing that she completed ninth grade and never earned her GED; attended special education classes; could only write her name and her daughters' names; required her daughters' assistance in filling out disability paperwork; had a driver's license test read to her; and had difficulty with short term memory. R. 40–41, 44–45, 49. A consultative examination performed by licensed clinical psychologist Jeffrey B. Luckett, Ph.D., in August 2010 showed that Miller's working memory and full scale IQ abilities were within the borderline range of intellectual abilities, with a full scale IQ score of 74. R. 413–14. Intellectual testing showed that Miller's verbal comprehension and perceptual reasoning abilities were within the low average range of intellectual ability, and that her processing speed was in the mentally deficient range of intellectual abilities. Dr. Luckett concluded that Miller would be capable of performing simple and repetitive tasks without difficulty, and that from a "psychological standpoint" Miller would be able to work a full-time job. R. 415. Additionally, two state agency psychologists who reviewed Miller's medical records—Richard J. Milan, Jr., Ph.D. and Louis Perrott, Ph.D—found that Miller would be capable of performing simple, routine tasks with minimal social demands at work. R. 85–87, 125–127.

When the ALJ asked the vocational expert whether there were available light, unskilled jobs with simple, routine, and repetitive tasks limited social interaction available for someone

13

with Miller's vocational profile, the vocational expert indentified the jobs of production inspector (3,000 positions in Virginia, 125,000 nationally) and packer (7,000 positions in Virginia, 310,000 nationally). R. 56–58.[5] The vocational expert testified that he was aware of the Department of Labor's ("DOL") information and statistics regarding general learning ability and IQ scores, and DOL's general conclusion that people with a learning ability and IQ in the lowest 10 percent of the population—corresponding to an IQ score of 81—are generally precluded from sedentary unskilled jobs. R. 65–66. The ALJ would not permit Miller's attorney to ask the vocational expert whether Miller, with an IQ of less than 81, was precluded from performing sedentary, unskilled jobs. The ALJ stated that he would only permit the question if the question identified what limitations would accompany that IQ score so that the testimony identified vocational abilities as opposed to psychological testimony. R. 66–68.

    I find that substantial evidence supports the ALJ's finding that Miller was capable of performing jobs that existed in significant numbers in the national economy. The important issue before the ALJ is whether a mental impairment such as borderline intellectual functioning causes any work-related limitation. Simply including an IQ score in a hypothetical question to a vocational expert without providing specific corresponding functional limitations does not appropriately advance this inquiry. See Fisher v. Barnhart, 181 F. App'x 359, 365 (4th Cir. 2006) ("Vocational experts are not experts in psychology who are qualified to render opinions on how the claimant's ailments might be reflected in his capabilities; rather, they are employment experts who know the mental and physical demands of different types of work."); see also Norris v.

---

[5] The vocational expert also testified that Miller's former job as hearing aid solderer did not have an exact corresponding occupational code in the Dictionary of Occupational Titles ("DOT"), but that representative jobs existed at both the semi-skilled and unskilled levels. R. 56–57. If considered an unskilled position, the vocational expert testified that it "would be a possibility" that a person with Miller's RFC and vocational profile could return to that work. However, upon further testimony from Miller, the vocational expert testified that her past work as a solderer was semiskilled. R. 71.

14

Case 6:13-cv-00039-NKM-RSB   Document 22   Filed 08/05/14   Page 14 of 17   Pageid#: 574

Astrue, 7:07-CV-184-FL, 2008 WL 4911794, at *15 (E.D.N.C. Nov. 14, 2008) (ALJ need not include IQ score in hypothetical where intellectual deficiencies otherwise adequately captured by restriction to simple tasks). I find that the ALJ correctly limited the questioning of the vocational expert and required that any hypothetical question which included Miller's IQ also include specific limitations associated with this IQ.

The ALJ's inclusion in his hypothetical question of a limitation to simple, routine, repetitive tasks was supported by the record and produced the representative job of packer. The existence of 7,000 packer jobs in the regional economy and 310,000 packer jobs in the national economy is sufficient for the Commissioner to meet its burden at step five in the sequential analysis.[7] Hicks v. Califano, 600 F.2d 1048, 1051 n.2 (suggesting that as few as 110 jobs in regional economy constitute a significant number).

Miller further argues, however, that she is incapable of performing a packer job because the DOT's definitional requirements suggest that the job requires a reasoning development level of two[8] and language development level of one, the lowest level.[9] Miller argues that her limited ability to read and write precludes her from any job at either of these two levels. However, these

---

[7] The vocational expert testified that Miller could work as a solderer or packer with her RFC. However, the solderer job was eliminated at the hearing by the ALJ since it was semiskilled (R. 71), and the Commissioner agrees that the inspector position should likewise have been excluded as semiskilled. Def.'s Br. Summ. J. 15.

[8] Under the DOT, a job with a reasoning level of two requires an individual to "[a]pply commonsense understanding to carry out simple one- or two-step instructions [and] [d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." DOT, App. C § III, 1991 WL 688702.

[9] A job with a language development level of one is defined as:

> Reading: Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute. Compare similarities and differences between words and between series of numbers.
>
> Writing: Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.
>
> Speaking: Speak simple sentences, using normal word order, and present and past tenses.

DOT, App. C § III, 1991 WL 688702.
15

Astrue, 7:07-CV-184-FL, 2008 WL 4911794, at *15 (E.D.N.C. Nov. 14, 2008) (ALJ need not include IQ score in hypothetical where intellectual deficiencies otherwise adequately captured by restriction to simple tasks). I find that the ALJ correctly limited the questioning of the vocational expert and required that any hypothetical question which included Miller's IQ also include specific limitations associated with this IQ.

The ALJ's inclusion in his hypothetical question of a limitation to simple, routine, repetitive tasks was supported by the record and produced the representative job of packer. The existence of 7,000 packer jobs in the regional economy and 310,000 packer jobs in the national economy is sufficient for the Commissioner to meet its burden at step five in the sequential analysis.[7] Hicks v. Califano, 600 F.2d 1048, 1051 n.2 (suggesting that as few as 110 jobs in regional economy constitute a significant number).

Miller further argues, however, that she is incapable of performing a packer job because the DOT's definitional requirements suggest that the job requires a reasoning development level of two[8] and language development level of one, the lowest level.[9] Miller argues that her limited ability to read and write precludes her from any job at either of these two levels. However, these

---

[7] The vocational expert testified that Miller could work as a solderer or packer with her RFC. However, the solderer job was eliminated at the hearing by the ALJ since it was semiskilled (R. 71), and the Commissioner agrees that the inspector position should likewise have been excluded as semiskilled. Def.'s Br. Summ. J. 15.

[8] Under the DOT, a job with a reasoning level of two requires an individual to "[a]pply commonsense understanding to carry out simple one- or two-step instructions [and] [d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." DOT, App. C § III, 1991 WL 688702.

[9] A job with a language development level of one is defined as:

> Reading: Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute. Compare similarities and differences between words and between series of numbers.
>
> Writing: Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.
>
> Speaking: Speak simple sentences, using normal word order, and present and past tenses.

DOT, App. C § III, 1991 WL 688702.

DOT's definitional requirements "are merely advisory in nature and serve only as a reference for the ALJ and VE." Warf v. Shalala, 844 F. Supp. 285, 289 (W.D. Va. 1994). If the definitional requirements were binding, it "would lead to the absurd result of rendering anyone who is illiterate unqualified and unable to perform any of the jobs in the DOT." Id. at 290. Such a contradictory result is illustrated by the fact that Miller's limited reading and writing ability did not preclude her from previously working for about six years as a hearing aid solderer, which had a reasoning development level of two and language development level of three—each a level higher than the packer job. DICOT 726.684-034, 1991 WL 679599. Nothing in the record suggests a change in Miller's intellectual functioning since she last worked that would call into question her ability to handle the intellectual demands of a packer job.

In conclusion, substantial evidence in the record supports the RFC developed by the ALJ and the ALJ's finding that Miller could perform jobs available in the national economy, such as a packer job. A consultative expert and two state agency psychologists found that Miller was capable of performing the work tasks contained in the RFC, despite her intellectual limitations. The vocational expert was present for and considered the reading, writing, and memory limitations that Miller testified to at the administrative hearing, and the vocational expert testified that Miller could still perform some work. The DOT suggests that Miller's previous job soldering hearing aids required a higher level of reasoning and language skills than the packer job the ALJ found her capable of performing. A reasonable mind could draw the conclusion from this record that Miller's intellectual limitations did not preclude her from all work. Accordingly, I find neither remand nor reversal is not warranted on this ground.

16

## CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Norman K. Moon, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

Enter: August 5, 2014

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge